# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA

| | |
|---|---|
| SOUTHWEST IOWA RENEWABLE ENERGY, LLC,<br><br>Plaintiff,<br><br>v.<br><br>BUNGE NORTH AMERICA, INC.,<br><br>Defendant. | Case No.<br><br><br>**COMPLAINT** |

Plaintiff Southwest Iowa Renewable Energy, LLC ("Plaintiff" or "SIRE"), for its Complaint against Defendant Bunge North America, Inc. ("Defendant" or "Bunge"), states and alleges as follows:

## PARTIES

1. SIRE is an Iowa limited liability company with hundreds of members with citizenship in the following states: Iowa, Nebraska, Wisconsin, Minnesota, Arkansas, Colorado, Illinois, Texas, Washington, Kansas, Missouri, Ohio, Arizona, California, Oregon, South Dakota, Florida, Pennsylvania, Nevada, Maryland, Oklahoma, Indiana, and Connecticut. SIRE's principal place of business is in Council Bluffs, Iowa.

2. Bunge North America, Inc. is a New York corporation with its principal place of business in Chesterfield, Missouri. For purposes of determining diversity jurisdiction under 28 U.S.C. § 1332, Bunge is a citizen of New York and Missouri.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this Complaint asserts claims between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

1

4. Venue is proper in the Southern District of Iowa under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this district.

5. Additionally, venue is proper pursuant to the forum-selection clause of the Agreement (defined herein) consenting to the venue of this Court.

## FACTUAL BACKGROUND

### THE PARTIES

6. SIRE is a state of the art dry-mill grain processing facility producing, among other products, millions of gallons of fuel grade ethanol annually from grain originating from a large portion of southwest Iowa and several counties in southeast Nebraska.

7. Bunge is an agronomic business focused on grain origination, sale, and export in North America. Specifically, Bunge buys, handles, conditions, and stores agricultural commodities produced by North America's growers.

8. Bunge also serves the domestic market in Mexico through operation of two different business units: dry milling corn, and vegetable oils and fats.

9. Bunge advertises ethanol as one of the commodities it trades.

10. Bunge maintains an oilseed processing facility operation located in Council Bluffs, Iowa, within ten miles of SIRE's ethanol production operation and headquarters.

*Overview of how Ethanol is Marketed*

11. In the ethanol market, it is common practice for ethanol producers, like SIRE, to contract with ethanol marketers. The role of the ethanol marketer is to actively seek out ethanol buyers in the market and attempt to contract with ethanol buyers at the best price possible.

12. Ethanol producers seek out marketers for their knowledge and expertise of a highly specialized and highly regulated marketplace. A competent marketer is critical to a

2

successful ethanol production operation, as the marketer represents the ethanol producer's path to market.

13. Ethanol marketers provide value to ethanol producers in a variety of ways.

14. A commercially reasonable ethanol marketer will employ a staff of highly experienced individuals to manage both the relationship with ethanol producers and the relationship with those purchasing the ethanol ("end-users").

15. When ethanol marketers contract with end-users, there are two separate pricing methods used: fixed and indexed. Fixed pricing locks in a certain price for ethanol to be delivered to an end-user quarterly. Indexed pricing, on the other hand, is utilized during spot sales for immediate end-user needs. The contract price for these spot sales will change with the daily pricing of ethanol on the national stock exchange.

16. An ethanol marketer who uses commercially reasonable methods for selling a producer's ethanol will examine and utilize both types of sales in order to deliver maximum value to the ethanol producers. The ethanol marketer will also provide recommendations to the producer so the producer can best understand the different sales opportunities, and further understand what pricing or type of sale is best based upon market conditions.

17. As it is the ethanol marketer incurring the obligation to provide ethanol to the end-user, as the ethanol marketer takes title to the ethanol from the producer prior to transferring to the end-user, the ethanol marketer is also principally responsible for the transportation logistics of delivering the ethanol producer's ethanol to the end-user.

18. For commercially reasonable ethanol marketing, that would mean negotiating directly with rail lines to achieve lower rates for shipping of the ethanol. The ethanol marketer would also be responsible for management of trucks used for delivering ethanol.

19. In order to maximize an ethanol producer's revenue, an ethanol marketer must have expertise with both federal and state renewable fuel standards. Generally speaking, under various renewable fuel standard regimes, ethanol may be more profitable in a specific market (e.g., California) if the ethanol producers and marketers can comply with the various regulatory regimes.

20. For example, and as will be relevant later, California has created a regulatory regime known as the Low Carbon Fuel Standard ("LCFS") which is administered by the California Air Resources Board ("CARB"). Under the LCFS, the market is encouraged to adopt low-carbon intensity fuels through the use of a deficit/credit system. CARB sets a "benchmark" of carbon intensity and if a fuel has a higher carbon intensity than the benchmark, a deficit is generated, but fuels with a lower carbon intensity, like ethanol, generate LCFS credits. Those that must prove adherence to the LCFS requirements are commonly referred to as "Regulated Parties." The Regulated Parties include petroleum importers, refiners, and wholesalers. At the end of each annual compliance period, the Regulated Parties must demonstrate that the mix of fuels utilized meet the LCFS carbon intensity standards. The result of this regulatory regime is that fuels which fall below the carbon intensity benchmark provide Regulated Parties with additional value, which ultimately inures to the benefit of low carbon intensity fuel producers like SIRE.

21. California's LCFS is just one example of a very dynamic and changing industry. New marketing opportunities and technology continue to develop such as the market for ethanol through the Sustainable Aviation Fuel program ("SAF") or the advancing "D3 RIN" marketplace. "RINs" refer to Renewable Identification Numbers which are credits that were created as part of the United States' Renewable Fuel Standard ("RFS") program. Under this program, renewable

fuels can fall into a number of categories based on the feedstock used, fuel type produced, energy inputs, and greenhouse gas reduction thresholds, amongst other requirements. "D3" refers to cellulosic biofuel. D3 RINs can be generated through the ethanol production process, and the market for D3 RINs is currently soaring due to the new technology advances that have surfaced only recently for utilization by ethanol producers, like SIRE.[1]

*SIRE Contracts with Bunge for Ethanol Marketing Services*

22. In 2020, SIRE contracted with Bunge to market and sell all of SIRE's ethanol (hereinafter, the "Agreement"), attached hereto as **Exhibit 1** of the Complaint.

23. Pursuant to Section 5.3 of the Agreement, SIRE agreed to pay Bunge ▮▮▮▮▮ a month from January 1, 2020 to December 31, 2026 (the "Term" of the Agreement). This monthly payment is referred to as the Marketing Fee.

24. Under the Agreement, SIRE sells Bunge all of the ethanol that SIRE produces. Pursuant to Section 2.1 of the Agreement, Bunge enters into contracts with third-party ethanol buyers in order to sell SIRE's ethanol at the highest prices possible. All revenue from these sales is returned to SIRE on a monthly basis by Bunge.

25. In exchange for the Marketing Fee, Bunge took on a number of obligations related to its marketing of SIRE's ethanol and also made a number of continuing representations and warranties related to its efforts to market SIRE's ethanol throughout the Term of the Agreement.

26. Pursuant to Section 2.1(c) of the Agreement, Bunge agreed to the following:

> Bunge agrees to use commercially reasonable efforts to market the Ethanol to maximize the sale price and minimize related costs, subject to prevailing market conditions.

27. Pursuant to Section 7(a) of the Agreement, Bunge represented and warranted the

---

[1] "Cellulosic waiver credits in the spotlight as D3 RIN prices remain high." Explaining the uptick in prices for D3 RINs.

following:

> Bunge represents and warrants to [SIRE] that Bunge, either through its own management or through lawful contracts entered into with third parties, currently has and shall maintain or cause to be maintained (i) such licenses, permits and/or authorities as may be required to lawfully engage in the purchase and sale of Ethanol, and (ii) commercially reasonable personnel and resources to perform its duties under this Agreement.

28. Pursuant to Section 7(b) of the Agreement, Bunge represented and warranted the following:

> Bunge represents and warrants to [SIRE] that: all necessary corporate action has been taken to authorize the execution, delivery and performance of this Agreement; the execution, delivery and performance of this Agreement by Bunge does not, and will not, violate or constitute a breach of or default under any Governmental Requirement (as defined in Section 15.3) or any indenture, contract or other instrument to which its assets are bound or to which the representing party's business is subject.

29. Pursuant to Section 15.3 of the Agreement, a "Government Requirement" is defined as:

> all laws, statutes, codes, ordinances and governmental rules, regulations and requirements of any governmental authority that are applicable to the Parties, the property of the Parties or activities described in or contemplated by this Agreement.

### BUNGE FAILS TO MAINTAIN COMMERCIALLY REASONABLE PERSONNEL OR USE COMMERCIALLY REASONABLE EFFORTS TO MARKET SIRE'S ETHANOL

*Bunge Fails to Maintain Commercially Reasonable Personnel to Market SIRE's Ethanol*

30. Until approximately November of 2022, Bunge complied with the Agreement and successfully marketed SIRE's ethanol.

31. Much of the success during this period boiled down to two factors: 1) Bunge's investment in and focus on the ethanol market, and 2) the commercially reasonable personnel Bunge employed to market SIRE's ethanol.

32. For example, prior to November of 2022, Bunge assigned personnel to market SIRE's ethanol who attended several ethanol industry conferences each year, continually provided recommendations to SIRE on exactly when to sell its ethanol on a weekly basis and had knowledge of and advised SIRE on future forecasted opportunities for different commercial markets to target for ethanol sales, among other details.

33. These efforts allowed SIRE to sell its ethanol at an average price that was consistent with other Nebraska and Iowa regional ethanol producers, according to a benchmarking data service known as Christianson CPAs & Consultants Biofuels Benchmarking™ ("Christianson") that SIRE obtains via a paid-for subscription.

34. Prior to January 1, 2020, Bunge had invested in several different ethanol plants across the United States and internationally.

35. Up until November 29, 2022, marketing of SIRE's ethanol was the sole responsibility of a single Bunge employee who was the only individual at Bunge conversant with ethanol buyers and versed in SIRE's economic needs and objectives.

36. This Bunge employee, Jeremy Ragan ("Jeremy"), attended several ethanol conferences each year, provided detailed recommendations to SIRE concerning when it should sell its existing ethanol gallons to maximize profits, provided detailed forecasts concerning additional markets to sell SIRE's ethanol in and how to prepare for such markets (e.g. SAFs), and provided SIRE with detailed financial reporting to show how SIRE was performing in the ethanol market in comparison to other competitors. Jeremy was the leading presenter at monthly meetings of the SIRE Risk Management Committee, where he provided information on all of the foregoing and led Committee discussion, with a view to marketing strategy for the following month.

37. However, on November 29, 2022, Jeremy informed SIRE that Bunge had terminated his employment without giving any advance notice to SIRE. Advanced notice and a transitionary plan were required under the Agreement because to market ethanol in a commercially reasonable manner, the marketer must be communicating with buyers every day. Without a transitionary plan in place, Bunge was unable to meet this obligation.

38. On November 30, 2022, the General Manager of Liquid Oils for Bunge, Derrick Augspurger, discussed with SIRE the possibility of tolling the Agreement, recognizing that without Jeremy, Bunge was not capable of satisfying its obligations under the Agreement.

39. The effect of Bunge's termination of Jeremy and its lack of notice or planning was felt by SIRE immediately.

40. For example, following Jeremy's departure, Bunge provided limited information on commodities and ethanol markets monthly to SIRE at its Risk Management Committee meetings. However, the information provided consisted only of generic slides of information that Bunge obtained through commercial sources. This brief review of commercially available information was a stark contrast to Jeremy's active discussions and strategy development he conducted on behalf of SIRE.

41. In at least one instance, the individual hired by Bunge to market SIRE's ethanol had virtually no previous work experience marketing ethanol prior to assuming this role.

42. This assignment of a marketing contact for SIRE following Jeremy's departure started an unsettling trend where SIRE would receive a new marketer every few months at Bunge. The result of these constant transitions was that the marketers failed to ever become fully acquainted with ethanol buyers, failed to have an understanding of SIRE's ethanol business, and failed to become aligned or support SIRE's strategic objectives, resulting in reduced revenue.

43. Since approximately November of 2022, Bunge has made it clear that it does not see the marketing or production of ethanol as core to its business strategy.[2]

44. Upon information and belief, today Bunge does not maintain any ownership interest in an ethanol producer entity utilizing corn to ethanol technology.

45. This shift in focus away from ethanol was reflected in Bunge's failure to maintain commercially reasonable personnel and resources that are necessary in order to maintain the requisite knowledge of the ethanol market for purposes of obtaining the highest price possible for SIRE's ethanol.

46. Since Jeremy's departure, Bunge has failed entirely to exercise commercially reasonable efforts to market SIRE's ethanol.

*Bunge Fails to Exercise Commercially Reasonable Means to Market SIRE's Ethanol*

47. With new, inexperienced Bunge employees following Jeremy's departure tasked with marketing SIRE's ethanol:

   a. SIRE employees have had to educate Bunge's marketing associates on common vernacular within the ethanol industry, how to market ethanol, and how to target market, all of which should be information which should already be known by the individual tasked with marketing SIRE's ethanol.

   b. Bunge's marketing representative has sold ethanol at old or wrong values.

   c. Bunge's marketing representative has left SIRE without knowledgeable, adequate marketing coverage when trades were needed when that individual was absent.

   d. Bunge's marketing representative has made sales while being completely

---

[2] "UPDATE 1-BP, Bunge to sell Brazil sugar and ethanol venture – report" Regarding the sale of the joint sugar and ethanol venture, Bunge stated "it is not core to our overall business strategy."

unaware of the competing value of LCFS gallons in California.

e. Bunge's marketing representative has no knowledge of the new marketing opportunities available for ethanol and has made no plans whatsoever with SIRE to enter these markets, in comparison to many of SIRE's competitors. These markets include, but are not limited to, the LCFS, SAFs and D3 RINS markets.

48. SIRE has evaluated its financial performance in comparison to its competitors utilizing the service of Christianson, which has allowed SIRE to understand its revenue yields in comparison to other ethanol competitors in the Nebraska and Iowa region.

49. All of these deficiencies and errors have resulted in SIRE losing profits on, at times, a daily basis.

50. Based on Christianson comparisons of ethanol sale prices with other similar ethanol producers in SIRE's specific Iowa and Nebraska regional market, Bunge's deficient marketing services have cost SIRE at least $7 million dollars between October 1, 2022 through December 31, 2023.

51. SIRE's damages have continued to accrue daily.

*Bunge Fails to Submit Necessary Reports in Order to Sell SIRE's Ethanol in California*

52. Bunge failed to comply with 7(a) and 7(b) of the Agreement by failing to submit the legally required report on transportation fuel transactions and credit transfers to CARB in accordance with CARB's annual compliance calendar for the 2022 year.

53. Under the LCFS regulations, SIRE is classified as "fuel pathway applicant/holder." Specifically, SIRE is a tier 1 pathway holder.

54. Bunge is a "fuel reporting entity" under the LCFS regulations. For the sale of ethanol into California under the LCFS, California maintains its own reporting tool and credit bank & transfer system ("LRT-CBTS"). Under the LCFS, all regulated entities are required to report transportation fuel transactions and credit transfers to CARB in accordance with an annual compliance calendar maintained by CARB.

55. Under California Code of Regulations Title 17 § 95488.8, a fuel marketer like Bunge must submit a Fuel Pathway Application to CARB which includes various information regarding environmental attributes of the fuel that Bunge is selling such as: feedstocks used to produce the fuel, fuel and feedstock production technology, regions where the feedstock and fuel were produced, modes to transport the feedstocks, types and amounts of thermal and electrical energy consumed in the feedstock and fuel production, and information regarding the carbon intensity and fuel lifecycle.

56. For SIRE and Bunge, Bunge purchases carbon credits from SIRE so that Bunge may transfer those credits to the end user in California. That clearing of credits must be reported and done through the LRT-CBTS system tool.

57. Bunge did not submit the necessary report to California under the LRT-CBTS for 2022 transactions in California.

58. This report is required by the annual compliance calendar maintained by CARB.

59. On March 15, 2024, Bunge informed SIRE that it believed Bunge was not required to submit the aforementioned report to CARB.

60. This position demonstrates that Bunge has failed to utilize commercially reasonable methods to market SIRE's ethanol. Anyone sufficiently versed in the ethanol industry would understand Bunge's reporting obligations to CARB. Reporting obligations for the LCFS

11

are *basic training* materials for ethanol marketers.

61. After SIRE explained to Bunge its reporting obligations to CARB, on April 30, 2024, Bunge reversed positions, recognizing that it had failed to timely submit a required third-party verification of Quarterly Fuel Transactions to CARB for calendar year 2022 and reported to SIRE that it finally filed the necessary report on behalf of SIRE.

62. Under California Code of Regulations Title 17 § 95494, SIRE (or its marketer of ethanol, Bunge) may be enjoined from selling SIRE's corn fiber ethanol in California if the proper report and attestations are not submitted timely.

63. Thus, due to Bunge's lack of expertise in the marketing of ethanol, it potentially has foreclosed its ability to sell SIRE's ethanol in California, which would have a devastating economic effect on SIRE.

## **SIRE SEEKS TO TERMINATE THE AGREEMENT**

64. Section 6.2 of the Agreement states that

> (a) Either party may terminate this Agreement immediately upon notice to the other Party if such other Party has (i) materially breached any representation, warranty, or obligation under this Agreement, and (ii) failed to remedy such breach within 30 days after the terminating Party has given notice of such breach, or if such breach cannot reasonably be cured within such 30-day period, such other Party has failed to commence and diligently pursue remedy of the breach and failed to remedy such breach not later than 120 days after the terminating Party has given notice of such breach.

65. Pursuant to Section 6.2 of the Agreement, SIRE sent Bunge a notice of termination on February 29, 2024 (the "Termination Notice") to identify the failures of Bunge to sell SIRE's ethanol in a commercially reasonable manner and its failure to submit the necessary CARB report previously identified in Paragraph Nos. 24-57.

66. Since the Termination Notice, Bunge has made no efforts to remedy the breaches identified by SIRE, with the exception of allegedly filing the CARB report in approximately April 2024, months beyond the deadline to do so.

67. Because Bunge failed to remedy the breaches outlined in the Termination Notice, SIRE terminated the Agreement on July 31, 2024, over 120 days after the Termination Notice was served.

68. SIRE provided notice to Bunge that it intends to honor existing contracts that Bunge has entered into on behalf of SIRE for the sale of ethanol through the date of termination of the Agreement.

## COUNT I – BREACH OF CONTRACT

69. SIRE incorporates by reference the allegations set forth above as if fully set forth herein.

70. SIRE entered into a valid, enforceable Agreement with Bunge on January 1, 2020.

71. Under the Agreement, Bunge agreed to market SIRE's ethanol using commercially reasonable efforts to maximize the sale price of SIRE's ethanol and minimize related costs, subject to prevailing market conditions.

72. Under the Agreement, Bunge also agreed to maintain commercially reasonable personnel and resources to perform its duties under the Agreement.

73. Under the Agreement, Bunge also agreed to maintain or cause to be maintained such licenses, permits and/or authorities as may be required to lawfully engage in the purchase and sale of Ethanol.

74. Bunge breached that Agreement by failing to use commercially reasonable efforts to maximize the sale price of SIRE's ethanol and minimize related costs, subject to prevailing market conditions.

75. Bunge breached that Agreement by failing to maintain commercially reasonable personnel and resources to perform its duties under the Agreement.

76. Bunge breached that Agreement by failing to maintain or cause to be maintained such licenses, permits and/or authorities that were required to lawfully engage in the purchase and sale of ethanol.

77. SIRE fully performed its obligations under the Agreement by providing Bunge with all of the denatured ethanol produced by SIRE and also by paying Bunge the monthly Marketing Fee.

78. As a direct and proximate result of Bunge's breach, SIRE has suffered financial injury in the amount of at least $7 million dollars, exclusive of interest, fees, and other costs.

79. SIRE is entitled to recover from Bunge the damages it sustained as a result of Bunge's breach, plus interest as allowed by law.

80. Accordingly, SIRE asks the Court to enter judgment in an amount of at least $7 million dollars, in addition to interest allowed by law, and for such other relief deemed just and equitable under the premises.

**COUNT II – UNJUST ENRICHMENT**
**(Pled Alternatively to Count I)**

81. SIRE incorporates by reference the allegations set forth above as if fully set forth herein.

82. SIRE allowed Bunge to market all of the denatured ethanol SIRE produced from January 1, 2020 to approximately July 31, 2024.

83. SIRE also paid Bunge a monthly Marketing Fee from January 1, 2020 to approximately July 31, 2024.

84. The benefit to Bunge (i.e. the monthly Marketing Fee) was at the expense of SIRE, as SIRE could not sell its denatured ethanol to any other marketer of ethanol and Bunge received a monthly Marketing Fee.

85. Bunge, in justness and fairness, ought to pay for the benefits it received from SIRE.

86. Accordingly, SIRE requests the Court to enter judgment in an amount to be determined at trial for the benefits Bunge received, to SIRE's detriment, in addition to interest allowed by law, and for such other relief deemed just and equitable under the premises.

**COUNT III – BREACH OF EXPRESS WARRANTY**

87. SIRE incorporates by reference the allegations set forth above as if fully set forth herein.

88. Bunge has held itself out as a purported professional and expert in the marketing of ethanol.

89. Bunge expressly warranted and agreed to maintain commercially reasonable personnel and resources to perform its duties under the Agreement.

90. Bunge expressly warranted and agreed to maintain such licenses, permits and/or authorities as may be required to lawfully engage in the purchase and sale of ethanol.

91. SIRE relied on Bunge's express warranties in signing the Agreement.

92. As alleged herein, Bunge did not meet the express warranties that it provided pursuant to the Agreement by failing to maintain licenses, permits and/or authorities.

93. Further, Bunge did not meet the express warranties that it provided pursuant to the Agreement by failing to maintain commercially reasonable personnel and resources to perform its duties under the Agreement to obtain maximum revenues on behalf of SIRE for the sale of SIRE's denatured ethanol.

94. SIRE fully performed its obligations under the Agreement by providing Bunge with all of the denatured ethanol produced by SIRE and also by paying Bunge the monthly Marketing Fee.

95. As a direct and proximate result of Bunge's breach of its express warranty, SIRE has suffered financial injury in the amount of at least $7 million dollars of lost revenue, exclusive of interest, fees, and other costs.

96. SIRE is entitled to recover from Bunge the damages it sustained as a result of Bunge's breach of its express warranty, plus interest as allowed by law.

97. Accordingly, SIRE asks the Court to enter judgment in an amount of at least $7 million dollars, in addition to interest allowed by law, and for such other relief deemed just and equitable under the premises.

**COUNT IV – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

98. SIRE incorporates by reference the allegations set forth above as if fully set forth herein.

99. Every contract, including the Agreement, imposes an implied duty of good faith and fair dealing in its performance. The covenant embraces a pledge that neither party shall do anything that destroys or injures the rights of another party to receive the benefits of the contract or frustrates the basic purpose of the contract.

100. Bunge failed to perform the Agreement in good faith by failing to maintain commercially reasonable personnel and resources to perform its duties under the Agreement to obtain maximum revenues on behalf of SIRE for the sale of SIRE's denatured ethanol.

101. Bunge failed to perform the Agreement in good faith by failing to maintain or cause to be maintained such licenses, permits and/or authorities that were required to lawfully engage in the purchase and sale of denatured ethanol.

102. The actions of Paragraph Nos. 100-101 were exclusively within the control of Bunge.

103. The actions of Bunge violated the implied duty of good faith and fair dealing in the Agreement by, among other things, depriving SIRE of the benefits of its bargain under the Agreement.

104. As a result of Bunge's breaches, SIRE has been damaged, and continues to be damaged.

**COUNT V – DECLARATORY JUDGMENT**

105. SIRE incorporates by reference the allegations set forth above as if fully set forth herein.

106. On January 1, 2020, SIRE and Bunge entered into a written contract, a copy of which is hereto attached as Exhibit A and incorporated herein by reference.

107. An actual controversy exists between the parties related to whether Bunge has materially breached the Agreement.

108. This Court is authorized to issue declaratory judgments interpreting contracts.

109. A material breach under the Agreement has occurred because Bunge has failed to comply with the provisions of Sections 2.1(c) and 7(a) of the Agreement.

110. SIRE seeks a declaratory judgment that Bunge has materially breached the Agreement and SIRE is within its rights under the Agreement to terminate the Agreement pursuant to the termination procedures outlined in the Agreement, effective July 31, 2024.

## PRAYER FOR RELIEF

WHEREFORE, SIRE respectfully requests the following relief:

1. An entry of judgment in SIRE's favor in an amount of at least $7 million dollars, in addition to interest allowed by law;

2. Alternatively, an entry of judgment in SIRE's favor that Bunge was unjustly enriched by receiving the entire Monthly Marketing Fee from November 28, 2022 through the July 2024 payment, and award SIRE an amount that would represent the value that Bunge delivered to SIRE, if any, during this time;

3. An order declaring that Bunge has materially breached the Agreement, and that SIRE did not breach the Agreement when it terminated the Agreement on July 31, 2024; and

4. An order awarding SIRE such other relief as the Court deems just and proper.

DATED this 26th day of July 2024.

SOUTHWEST IOWA RENEWABLE
ENERGY, LLC, Plaintiff

By: /s/ Ryann A. Glenn
Ryann A. Glenn (AT0010530)
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
Tel: (402) 964-5000
Fax: (402) 964-5050
ryann.glenn@huschblackwell.com